**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Wayne Crowley, | No. CV-18-0561-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 18). Defendant filed his Answering Brief ("Response") (Doc. 20), and Plaintiff filed his Reply (Doc. 22). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.     BACKGROUND

### A.     *Procedural History*

On June 10, 2015, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB") and on June 24, 2015 filed a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of August 2, 2014 due to high blood pressure, back problem, shoulder problem, high cholesterol, and stomach problems. *See* Administrative Record ("AR") at 15, 17, 24, 54–60, 63–66, 74,

83–87, 183, 186, 203, 224.   The Social Security Administration ("SSA") denied this application on August 24, 2015.  *Id.* at 15, 54–62, 83–89, 91–94.  On September 17, 2015, Plaintiff filed a request for reconsideration, and on January 21, 2016, SSA denied Plaintiff's application upon reconsideration.  *Id*. at 15, 63–82, 95, 100–03.  On February 25, 2016, Plaintiff filed his request for hearing.  *Id.* at 15, 104–05.  On August 28, 2017, a hearing was held before Administrative Law Judge ("ALJ") Charles Davis.  *Id.* at 15, 30–53.  On January 10, 2018, the ALJ issued an unfavorable decision.  AR at 10–24.  On March 2, 2018, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on September 19, 2018, review was denied.  *Id.* at 1–5, 157.  On November 21, 2018, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.   Factual History

Plaintiff was fifty-three (53) years old at the time of the administrative hearing and fifty (50) at the time of the alleged onset of his disability.  AR at 15, 23–24, 32, 54–56, 60, 63–65, 74, 83, 85, 87, 158, 167, 183, 203, 224, 258.  Plaintiff obtained a high school diploma.  *Id.* at 54–55, 63–64.  Prior to his alleged disability, Plaintiff worked at a truck stop and video store, and as a taxi driver, customer service associate, and repossessor.  *Id.* at 33–34, 169–77, 188, 192–96, 213–17, 254, 262.

#### 1.   Plaintiff's Testimony

##### a.   Administrative Hearing

At the administrative hearing, Plaintiff testified that he last worked in approximately January of 2014.  AR at 32–33.  Plaintiff further testified that he worked at Lugs Truck Stop as a tire person when he stopped working, which was immediately preceded by driving a taxi.  *Id.* at 33, 48.  Plaintiff was uncertain regarding the timing of his previous work.  *Id.* at 33.  Plaintiff testified that he had performed seasonal work for Hastings entertainment, a video store, fulfilling mail orders.  *Id.*  Plaintiff described working as a customer service associate for Chamberlain Garage Doors in 2011–2012.  *Id.* at 34.  Plaintiff also confirmed that he had performed some repossession work, estimating that it had occurred in 2013–2014.  AR at 34.

Plaintiff denied that he had injured himself doing repossession work in May of 2015. *Id.* at 35.  Plaintiff testified that his injury was old, estimating that it occurred in 2004 or 2005 and happened on a rollercoaster.  *Id.*  Plaintiff further described his back and neck injuries were "long-term injuries."  *Id.*  Plaintiff testified that his inability to stand prevented him from working.  AR at 35.  Plaintiff further testified that his capabilities were limited due to his neck and back problems, including arthritis in his back and an old injury to his neck, both of which have deteriorated over time.  *Id.* at 35–36.  Plaintiff reported that he was seeing Dr. Chase at CNS and receiving injections in an effort to relieve his neck pain.  *Id.* at 36, 39.  Plaintiff testified that Tucson Orthopedics referred him to CNS because he was experiencing numbness in his left hand stemming from his neck.  *Id.* at 36, 44.  Plaintiff indicated that he has pain through his shoulder to his elbow which is exacerbated by sleeping the wrong way or lifting between ten (10) or fifteen (15) pounds the wrong way.  *Id.* at 44.  Plaintiff estimated that the pain lasts for two (2) to three (3) months when he has such an episode.  AR at 45.  Plaintiff further testified that he has heart palpitations daily that cause him to stop what he is doing.  *Id.*  Plaintiff explained that the heart palpitations are part of his anxiety and panic attacks.  *Id.* at 45–46.  Plaintiff testified that if has a panic attack he would need to take a break for the rest of the day.  *Id.*  Plaintiff described his back as "in pretty bad shape" and reported that he had severe arthritis.  *Id.* at 39.  Plaintiff also testified that he has been diagnosed with chronic laryngitis which causes him to completely lose his voice if he talks too long.  AR at 43.  Plaintiff testified that he sees Dr. Gray approximately six (6) times per year, and he has been Plaintiff's treating physician since 2008.  *Id.* at 40, 47.

Plaintiff noted that his medications included Zoloft and Ativan, as well as pain medication whose dosage had recently been doubled.  *Id.* at 40.  Plaintiff reported that his medications sometimes cause significant side effects.  *Id.*  Plaintiff testified that the Ativan did not interact well with medications for his heart and high blood pressure, and it made him drowsy so that he couldn't drive.  *Id.*  Plaintiff also indicated that he was having anxiety attacks in traffic, which did not work with the cab company.  AR at 40.  Plaintiff further

testified that Dr. Gray restricted his activities in 2013 or 2014.  *Id.* at 41.  Plaintiff clarified that Dr. Gray did not tell him not to drive but suggested that it would be a good idea to look for a job other than driving a taxicab based on his pain and anxiety medications.  *Id.* Plaintiff confirmed that he would drive if he had his own vehicle; however, employers require testing and they are not interested in his services once they learn what medications he is taking.  *Id.*

Plaintiff further testified that he is living in a modular home with his wife Rita.  *Id.* at 36–37.  Plaintiff also testified that Rita broke her back at work and had been on disability for fifteen (15) years.  AR at 37.  Plaintiff reported that Rita needs help around the house and up until then, he had been responsible for that care.  *Id.*  Plaintiff testified that Rita is able to bathe and dress herself, as well as handle the finances.  *Id.* at 37–38.  Plaintiff further testified that they shared the cooking, dish washing, and laundry responsibilities.  *Id.* at 37–38.  Plaintiff also testified that Rita does most of the grocery shopping but does not drive— they rely on a bus that picks them up.  *Id.* at 38.  Plaintiff reported that because Rita has so much trouble bending over, they try to limit their meals to things that can be cooked and then the container thrown away.  AR at 38.  Plaintiff reported his hobbies as golf and watching sports on television.  *Id.*  Plaintiff clarified that he cannot play golf and estimated that he last played in 2011 or 2013.  *Id.* at 38–39.  Plaintiff testified that does try to do stretching type exercises.  *Id.* at 39.  Plaintiff also testified that he has a couple of medium sized dogs that he cares for.  *Id.* at 40–41.

Plaintiff testified that he can walk for approximately fifteen (15) to twenty (20) minutes before he needs to sit down.  AR at 41–42.  Plaintiff further testified that he cannot sit and sleeps in the recliner.  *Id.* at 42.  Plaintiff also testified that he has to get a wheeled makeshift cart to drag a fifty (50) pound bag of dog food from his car approximately 100 feet up the stairs to the door.  *Id.*

#### b. Administrative Forms

##### i. *Work History Report*

On June 25, 2015, Plaintiff also completed a Work History Report.  AR at 192–211.

Plaintiff listed his prior work as a bulk products operation worker, customer service representative, taxi driver, and warehouse worker.  *Id.* at 192.  Plaintiff described his job as bulk products operation worker as fourteen (14) hours per day, five (5) days per week, without further information.  *Id.* at 193.   Plaintiff described his first customer service position as lasting nine (9) hours per day, six (6) days per week, without further information.  *Id.* at 194.  Plaintiff's second customer service position description was identical to the first.  *Id.* at 195.  Plaintiff described the position of taxi driver as lasting fourteen (14) hours per day, six (6) days per week, without further information.  AR at 196. Finally, Plaintiff described his position of warehouse worker as lasting nine (9) hours per day, six (6) days per week, without further information.  *Id.* at 197.

On November 16, 2015, Plaintiff completed a second Work History Report.  *Id.* at 213–20.  Plaintiff listed his past work as including material handler—warehouse services, product operator, customer service, and taxi driver.  *Id.* at 213.  Plaintiff described his first position as driving a forklift and loading and unloading product onto a semi-trailer.  *Id.* at 214.  Plaintiff reported that this position involved the use of machines, tools, or equipment; technical knowledge or skills; and involved writing, completing reports, or similar duties. AR at 214.  Plaintiff further reported walking and standing for between two (2) and four (4) hours per day; sitting between six (6) and twelve (12) hours; climbing and crawling for an hour per day; kneeling, crouching, and reaching for eight (8) hours per day; handling, grabbing, or grasping big objects for between two (2) and six (6) hours per day.  *Id.* Plaintiff reported that the heaviest weight that he lifted was 100 pounds or more, and that he frequently lifted fifty (50) pounds or more.  *Id.* at 214.  Plaintiff indicated that he did not supervise other people, nor did he hire and fire employees, but confirmed that he was a lead worker.  *Id.*

Plaintiff described his second position as involving walking around ten (10) acres of the job site loading and moving product throughout the plant.  *Id.* at 215.  Plaintiff reported using machines, tools, or equipment; technical knowledge or skills; and performed writing, completing reports, or other similar duties.  AR at 215.  Plaintiff further reported

walking; standing; climbing; kneeling; crouching; stooping; reaching; and handling, grabbing, or grasping big objects for twelve (12) hours per day. *Id.* Plaintiff indicated crawling, writing, typing, or handling small objects for approximately four (4) hours per day. *Id.* Plaintiff noted that he carried equipment for his entire shift for safety reasons. *Id.* Plaintiff stated that the heaviest weight he lifted was 100 pounds or more and that he frequently lifted fifty (50) pounds or more. *Id.* Plaintiff also indicated that he did not supervise other people; hire or fire employees; or act as a lead worker. AR at 215.

Plaintiff described his third position as working in customer service at desk troubleshooting customer issues via telephone. *Id.* at 216. Plaintiff noted that some field work was involved. *Id.* Plaintiff indicated that he used machines, tools, or equipment; technical knowledge or skills; and wrote, completed reports, or performed similar duties. *Id.* Plaintiff reported that he stood, sat, reached, and wrote, typed, or handled small objects for between eight (8) and ten (10) hours per day; walked, kneeled, crouched, and handed, grab or grasped big objects for approximately three (3) hours per day; and did not climb, crawl, or stoop. *Id.* Plaintiff indicated that the heaviest weight he lifted was twenty (20) pounds and frequently lifted ten (10) pounds. AR at 216. Plaintiff denied supervising other people; hiring or firing employees; or acting as a lead worker. *Id.*

Plaintiff described his fourth position as driving customers to destinations per their request. *Id.* at 217. Plaintiff indicated that he used machines, tools, or equipment and technical knowledge or skills, as well as wrote, completed reports, or performed other similar duties. *Id.* Plaintiff reported that he sat for between twelve (12) and sixteen (16) hours per day; stood, crouched, reached, handled, grabbed, or grasped big objects, and wrote, typed, or handled small objects for two (2) hours per day; and did not walk, kneel, climb, crawl, or stoop. *Id.* Plaintiff stated that he would carry groceries between ten (10) and twenty (20) feet for customers and that the job involved heavy carrying at times. AR at 217. Plaintiff indicated that the heaviest weight he lifted was fifty (50) pounds and he would frequently lift ten (10) pounds. *Id.* Plaintiff denied supervising others, hiring or firing employees, or being a lead worker. *Id.*

### *ii.  Exertional Daily Activities Questionnaire*

On December 16, 2015, Plaintiff completed an Exertional Daily Activities Questionnaire.  AR at 221–23.  Plaintiff reported that he lived in a house with his wife.  *Id.* at 221.  Plaintiff recounted his average day as including "do[ing] light work on property once a week or so[] [and] [h]elp[ing] [his] wife with house upkeep."  *Id.*  Plaintiff described his symptoms as follows:

> If I walk to far, 1/4 mile, I have chest pains, shortness of breath.  When I try to do any yardwork—cut grass/weedeat, I get severe arm pain with sharp pain in lower back that has a radiating pain shooting down my right leg. When I eat anything, I have issues trying to swallow.  Permanent laryngitis, heartburn 3–4 times a day, stomach problems[.]

*Id.* at 221.  Plaintiff reported that his garbage pick-up is approximately a quarter of a mile away and takes him ten (10) to twenty (20) minutes to walk.  *Id.*  Plaintiff stated that he cannot lift and carry twenty-five (25) to fifty (50) pounds, "[s]o taking out trash is torture on chest, arm, back, and right leg."  AR at 221.  Plaintiff indicated that if he does not have to walk far, he can carry a case of water from his driveway to the front door which is approximately thirty (30) yards.  *Id.*

Plaintiff reported that he grocery shops approximately twice per week with his wife. *Id.* at 222.  Plaintiff further reported that he cleans his own home, cooks, does laundry, yard work, or other household chores.  *Id.*  Plaintiff indicated that he uses the weedeater around the house, gate, and garage, which takes approximately two (2) weeks.  AR at 222.  Plaintiff noted that he can only hold the weedeater for between ten (10) and fifteen (15) minutes without severe pain in his arm and back.  *Id.*  Plaintiff also reported that he helps with dishes and cooking quick meals; however, because both he and his wife suffer from chronic pain the vacuuming occurs approximately once per month.  *Id.*  Plaintiff confirmed that he shares the housework with his wife—one will start and the other will finish.  *Id.*  Plaintiff reiterated that pain in his chest, arm, and back, as well as leg pain and shortness of breath, limit is ability to do house and yardwork.  *Id.*  Plaintiff denied doing any activities outside of the home.  AR at 222.  Plaintiff reported that prior to his health issues, he would do most

of the housework, laundry, and maintenance on four (4) acres of property. *Id.*

Plaintiff further reported sleeping approximately five (5) hours per night. *Id.* Plaintiff confirmed that he requires rest or naps during the day and estimated that these periods last approximately one (1) to two (2) hours. *Id.* Plaintiff also reported that he uses a cane and glasses. *Id.* at 223. Plaintiff indicated that the decline in activities has changed his life for the worse. AR at 223.

### 2. Vocational Expert Debra McLeary's Testimony

Ms. Debra McLeary testified as a vocational expert at the administrative hearing. AR at 15, 47–53. The ALJ asked Ms. McLeary to describe Plaintiff's past work. *Id.* at 47. Ms. McLeary classified Plaintiff's past relevant work as a material handler, Dictionary of Occupational Titles ("DOT") number 929.687-030, heavy exertional level, and a Specific vocational Preparation ("SVP") of 3. *Id.* at 48. Ms. McLeary described Plaintiff's work in customer service at the door company, DOT number 249.362-026, with a SVP of 4, and a sedentary exertional level. *Id.* Ms. McLeary also described Plaintiff's position as a taxi driver, DOT number 913.463-018, with an SVP of 3, and a medium exertional level. *Id.* at 48–49. Ms. McLeary could not find a garage door maker, so classified Plaintiff's position as construction worker I, DOT number 869.664-014, with an SVP of 4, and a heavy exertional level. AR at 52–53. Finally, Ms. McCleary described Plaintiff's past work as a cook, DOT number 313.361-014, with an SVP of 7, and a medium exertional level. *Id.* at 53.

### 3. Plaintiff's Medical Records

#### a. Treatment records[1]

On August 13, 2014,[2] Plaintiff was seen by Sean P. Dorado, P.A.-C for a follow-

---

[1] The Court has reviewed the entirety of Plaintiff's medical records; however, it has generally limited its summary to those records after the alleged onset date of August 2, 2014.

[2] The Court relies on the date PA Dorado signed the records; however, in some instances this date appears to be months after the actual encounter. Unfortunately, there are several possible dates in each record, and it is impossible to surmise which refers to the encounter date. Without more, and for consistency, the signature date is used as the date of encounter.

up.  AR at 337–40.  Plaintiff "report[ed] that besides the sensation of food getting stuck in his throat, patient reports that he is doing well."  *Id.* at 337.  PA Dorado's assessment of Plaintiff included *Helicobacter pylori* gastrointestinal infection, esophageal dysphagia, elbow pain or problem/disorder, and shoulder pain.  *Id.* at 338.  PA Dorado also noted regarding Plaintiff's esophageal dysphagia that the report regarding his barium swallow study was "relatively unremarkable."  *Id.* at 339.  On September 9, 2014, Plaintiff had routine laboratory work performed.  *Id.* at 329, 430.  Plaintiff's diagnoses included esophageal dysphagia, anxiety, hyperlipidemia, and hyperglycemia.  AR at 329, 430.

On April 21, 2015, Plaintiff had routine blood work performed.  *Id.* at 421–23, 517–19.  On April 22, 2015, Plaintiff had a follow-up with PA Dorado for his pain medication refill.  *Id.* at 341–43, 452–54.  PA Dorado's review of systems and physical examination were unremarkable.  *Id.*  PA Dorado's assessment included nicotine dependence, hypertension, and arthralgias.  *Id.* at 343, 454.  On April 24, 2015, Plaintiff had routine laboratory work performed.  AR at 330, 431.  Plaintiff's diagnoses included hyperlipidemia, hyperglycemia, and nicotine dependence.  *Id.*

On May 8, 2015, Plaintiff was seen by PA Dorado for a follow-up on his laboratory results.  *Id.* at 344–46, 455–57.  PA Dorado's review of Plaintiff's systems was generally unremarkable.  *Id.* at 344, 455.  PA Dorado's physical examination of Plaintiff was similarly unremarkable.  *Id.* at 345, 456.  PA Dorado assessed hyperlipidemia, hyperglycemia, and neoplasm of unspecified nature of bone, soft tissue, and skin—this last was due to an ant bite Plaintiff sustained on his left temple.  AR at 346, 457.  On May 15, 2015, Plaintiff had x-rays taken for shoulder pain and lumbosacral radiculitis.  *Id.* at 331–33, 357, 477, 623.  Kevin Kearney, M.D./M.B.A. read Plaintiff's films and found "[n]o compression fracture in the lumbar spine" and "[m]ild intervertebral disc space narrowing at the L4-L5 and L5-S1 levels."  *Id.* at 357, 477, 623.  Dr. Kearney's impression noted "[m]ild degenerative change in the lower lumbar spine."  *Id.*  PA Dorado also diagnosed Plaintiff with a dental disorder.  *Id.* at 331.  On May 18, 2015, Plaintiff saw PA Dorado complaining of left shoulder and low back pain that he reported had lasted for

approximately one (1) week.  AR at 347–50, 458–61.  Plaintiff reported that he was repossessing a car, his hand slipped while he was hooking it up, and he fell down straining his back.  *Id.* at 347,458.  Plaintiff further reported a severely abscessed tooth.  *Id.*  PA Dorado's review of Plaintiff's systems and physical examination were generally unremarkable.  *Id.* at 348–50, 458–60.  PA Dorado observed Plaintiff had marked discomfort beyond approximately 20 degrees of forward flexion and limitations on lateral bending and rotation.  *Id.* at 349, 460.  PA Dorado's assessment included lumbosacral radiculitis not otherwise specified, shoulder pain, and dental disorder.  AR at 349, 460.  On May 20, 2015, Plaintiff signed a pain management agreement regarding his lumbosacral radiculitis diagnosis.  *Id.* at 360–61.  On May 21, 2015, Plaintiff followed up with PA Dorado regarding his back pain.  *Id.* at 351–53, 462–64.  Plaintiff reported that Norco worked very well, but he became sleepy when he took a muscle relaxer.  *Id.* at 351, 462.  PA Dorado's physical examination of Plaintiff was generally unremarkable.  *Id.* at 352–53, 463–64.  PA Dorado reported that Plaintiff "ha[d] approximately 40 degrees of forward flexion, 5 degrees of backwards extension, [and] lateral bending and rotating c[ould] be accomplished but elicit[ed] pain."  AR at 353, 464.  PA Dorado assessed lumbosacral radiculitis not otherwise specified, spasm of muscle, and hypertension.  *Id.*  PA Dorado noted that Plaintiff's "films demonstrate[d] mild degenerative changes of the lumbar spine[,] [and] [Plaintiff] [wa]s to continue with conservative therapy, muscle relaxer and Norco."  *Id.* at 353, 464.

On September 1, 2015, Plaintiff had routine bloodwork performed.  *Id.* at 442.  On September 14, 2015, Plaintiff saw PA Dorado seeking "paperwork for a local bus ride to be filled out."  *Id.* at 465.  "When questioned about why he can not walk to the bus stop patient reports that he has been having episodes of chest pain with exertion[,] [and] reports that it has gotten him extremely anxious and nervous . . . [and] has had mood swings secondary to his anxiety."  AR at 465.  PA Dorado's review of systems and physical examination of Plaintiff were unremarkable.  *Id.* at 465-67.  PA Dorado's assessment included hyperlipidemia, hyperglycemia, nicotine dependence, chest pain, and anxiety.  *Id.*

at 467.  On October 21, 2015, Plaintiff had routine bloodwork performed.  *Id.* at 424–29.

On November 5, 2015, Plaintiff saw James Myer, M.D. for a cardiovascular evaluation.  *Id.* at 402–05, 417–20, 513–16.  Plaintiff complained of daily chest pain and denied orthopnea, paroxysmal nocturnal dyspnea, dyspnea on exertion, or edema.  AR at 402, 417, 513.  Plaintiff also denied palpitations, syncope or near syncope, claudication, or transient ischemic attack symptoms.  *Id.*  Dr. Meyer's review of systems and physical examination of Plaintiff were unremarkable.  *Id.* at 402–03, 417–18, 513–14.  Mr. Meyer's impression and plan included angina pectoris—unspecified and stable, essential hypertension—stable and adequately controlled, and nicotine dependence.  *Id.* at 403–04, 418–19, 514–15.  A stress test was recommended.  *Id.*  On November 18, 2015, Michael R. Gray, M.D. completed a Physical Assessment for Plaintiff.  AR at 440–41, 444–45, 710–11.  Mr. Gray's diagnoses included seizure disorder, fatigue, increased blood pressure, arthralgias, and low back pain.  *Id.* at 440, 444, 710.  Dr. Gray reported that Plaintiff's symptoms would frequently interfere with his ability to perform work-related tasks and listed side effects including gastroesophageal reflux disease ("GERD"), headaches, and fatigue.[3]  *Id.*  Dr. Gray opined that Plaintiff would need to recline or lie down during a hypothetical eight (8) hour workday and estimated that he could sit for one (1) hour and stand or walk for one (1) hour in an eight (8) hour workday.  *Id.*  Dr. Gray further opined that Plaintiff would need to take three (3) to four (4) unscheduled breaks of between approximately fifteen (15) and twenty (20) minutes during an eight (8) hour workday.  *Id.*  Dr. Gray indicated that Plaintiff could occasionally lift and carry ten (10) pounds or less but never lift and carry twenty (20) pounds or more.  AR at 440, 444, 710.  Dr. Gray also limited Plaintiff's ability to grasp, turn, and twist objects; fine manipulation; and reaching to ten (10%) for each arm.  *Id.*  Dr. Gray estimated that Plaintiff would be absent more than four (4) times per month as a result of his impairments.  *Id.* at 441, 445, 711.  Dr. Gray confirmed that Plaintiff's impairments were consistent with the symptoms and functional limitations that he described.  *Id.*

---

[3] The last symptom, "hyper—/—," cannot be discerned.

On December 16, 2015, as part of Plaintiff's Benson Area Transit ("BAT") Dial-A-Ride application, Dr. Gray certified that Plaintiff had functional or cognitive disabilities that prevented him from using BAT's fixed route service and he was permanently disabled. *Id.* at 447.  On December 21, 2015, Plaintiff saw Dr. Gray for a follow-up regarding his pain medication and to have his disability paperwork filled out.  AR at 469–472.  Dr. Gray noted that Plaintiff had a seizure in 2011, never followed up regarding a diagnostics, and has not had any since.  *Id.* at 469.  Dr. Gray's review of systems and physical examination of Plaintiff were unremarkable.  *Id.* at 469–71.  Plaintiff also complained of fatigue and malaise.  *Id.* at 471.

On January 28, 2016, PA Dorado ordered x-rays of Plaintiff's left shoulder and elbow, as well as physical therapy.  *Id.* at 450–51.  On January 29, 2016, Plaintiff was seen by PA Dorado complaining of left shoulder and arm pain, including elbow swelling.  AR at 473–76.  Plaintiff stated "that his pain has started in his arm about 10 years ago" and rated his pain 8–9/10.  *Id.* at 473.  PA Dorado noted that Plaintiff indicated that he had not had any chest pain because he had not been exerting himself.  *Id.*  PA Dorado's review of systems and physical examination of Plaintiff were unremarkable.  *Id.* at 473–75.  PA Dorado reported Plaintiff's left upper extremity strength 4/5, deep tendon reflexes 2+, with a full range of motion.  *Id.* at 475.  Plaintiff complained of tenderness to palpation of supraspinatus and triceps region.  AR at 475.

On February 4, 2016, Plaintiff had radiographs taken of his left shoulder.  *Id.* at 521, 697.  Alan Osumi, M.D. reviewed Plaintiff's films and found no abnormalities.  *Id.*  On February 29, 2016, Plaintiff followed up with PA Dorado regarding his left shoulder radiographs.  *Id.* at 551–54.  Plaintiff reported improvement of shoulder pain with medication.  *Id.* at 551.  PA Dorado's review of systems and physical examination of Plaintiff were generally unremarkable.  AR at 551–53.  PA Dorado noted a limited range of motion in Plaintiff's left shoulder and pain with abduction, as well as extension and flexion of his left bicep.  *Id.* at 553.  PA Dorado assessed hypertension and left shoulder and elbow pain.  *Id.*

On March 15, 2016, Plaintiff had an initial consult with cardiologist Jose Gonzalez, M.D. *Id.* at 654–57. Dr. Gonzalez noted Plaintiff's current symptoms to include chest pain, dyspnea, and fatigue. *Id.* at 654. In his review of systems, Dr. Gonzalez also noted fatigue and night sweats; use of glasses or contacts; periodontal disease, hoarseness, sore throat, and tooth pain; acid reflux symptoms, constipation, and heartburn; nocturia; arthralgias, back pain, joint stiffness; extremely dry skin; and anxiety, feelings of stress, and sleep disturbance. AR at 654. Plaintiff reported daily walking for exercise and golf for recreation. *Id.* Dr. Gonzalez's physical examination of Plaintiff was unremarkable. *Id.* at 655–56. Dr. Gonzalez assessed precordial chest pain, shortness of breath, mixed hyperlipidemia, and essential hypertension and ordered a stress test and stress echocardiogram. *Id.* at 656. On the same date, Plaintiff had an echo doppler performed. *Id.* at 661–62. Dr. Gonzalez noted that Plaintiff's intraventricular septum was hypokinetic, but otherwise his observations were generally unremarkable. AR at 661. Dr. Gonzalez concluded Plaintiff showed left ventricular systolic dysfunction and mild mitral, aortic, and tricuspid insufficiency. *Id.* On March 21, 2016, Plaintiff had x-rays of his cervical spine due to increasing nontraumatic neck pain. *Id.* at 520. Shirley A. Fiske, D.O. read the images and noted the absence of compression fracture or subluxation, moderate disc space narrowing with anteroposterior spurring at C6–C7, with additional marginal spurring present at C3–C4, C4–C5, and C5–C5, as well as a straightening of the spine. *Id.* Dr. Fiske also noted intervertebral foraminal narrowing at C6–C7 bilaterally, with mild narrowing on the right at C3–C6 and on the left at C7–T1. *Id.* On March 31, 2016, Plaintiff followed-up with PA Dorado regarding his cervical spine x-ray. AR at 547–50. Plaintiff indicated that he was feeling stressed and attributed it, in part, to his daughter and four (4) year old grandson moving into his home. *Id.* at 547. PA Dorado's review of systems and physical examination of Plaintiff were unremarkable. *Id.* at 547–49. PA Dorado assessed cervical radiculopathy, atypical chest pain, and anxiety. *Id.* at 549.

On April 12, 2016 Plaintiff was seen by Dr. Gonzalez for a stress echocardiogram. *Id.* at 652–53. Dr. Gonzalez noted Plaintiff's symptoms to include chest pain, dyspnea,

and fatigue, but negative to any others.  AR at 652.  Dr. Gonzalez reported an abnormal stress echocardiogram and prescribed Ranexa.  *Id.* at 652–53, 658–60.  On April 13, 2016, Plaintiff was seen by Christopher M. Untch, M.D. at Arizona Orthopedics regarding his left shoulder pain.  *Id.* at 628–32, 684–88.  Plaintiff reported having had left shoulder pain for approximately five (5) to ten (10) years, with physical therapy in 2008 that helped "for awhile."  *Id.* at 628, 684.  Dr. Untch's review of Plaintiff's systems was generally unremarkable and noted heartburn, anxiety, and back, joint, and neck pain with joint swelling.  *Id.* at 629, 685.  Dr. Untch's physical examination of Plaintiff was also unremarkable.  AR at 630–31, 686–87.  Dr. Untch noted biceps tenderness and a positive Hawkins test, as well as "very mild pain with Speeds [and] Yerg's[.]"  *Id.* at 630, 686.  Dr. Untch ordered magnetic resonance imaging ("MRI") based on Plaintiff's radiographs showing no abnormalities.  *Id.* at 631, 687.

On May 3, 2016, Plaintiff saw PA Dorado for a follow-up.  *Id.* at 543–46.  Plaintiff reported seeing his cardiologist and that he had found some abnormalities—the upper part of his heart was not beating under stress.  *Id.* at 543.  PA Dorado's review of systems and physical examination of Plaintiff were otherwise unremarkable.  AR at 543–45.  PA Dorado assessed cervical radiculopathy, atypical chest pain, and hyperlipidemia.  *Id.* at 545.  On May 4, 2016, Plaintiff was seen by Jose Gonzalez, M.D. for a cardiology prescription follow up.  *Id.* at 649–51.  Dr. Gonzalez listed Plaintiff's current symptoms to include "chest pain (with exertion and with emotional stress), dyspnea, exercise limitation and fatigue."  *Id.* at 649.  Dr. Gonzalez's remaining review of Plaintiff's systems and physical examination were unremarkable.  *Id.* at 649–50.  Dr. Gonzalez assessed myocardial ischemia, mixed hyperlipidemia, essential hypertension, precordial chest pain, and shortness of breath, and ordered further testing.  AR at 650.  On June 23, 2016, Plaintiff had a nerve conduction study of his left upper extremity. with normal results.  *Id.* at 645–48, 669–72, 693–96.

On August 24, 2016, Plaintiff again saw Dr. Untch regarding his left shoulder pain.  *Id.* at 633–36, 680–83.  Dr. Untch's review of Plaintiff's systems was unremarkable but

noted decreased mobility, joint instability, and joint tenderness. *Id.* at 634, 681. Dr. Untch's physical examination of Plaintiff was also unremarkable. *Id.* at 634–36, 681–82. Dr. Untch noted a normal nerve conduction study and the lack of clarity regarding Plaintiff's symptom description and exam findings. AR at 636, 683. On August 30, 2016, Plaintiff saw PA Dorado for a follow-up regarding blood work. *Id.* at 535–38. PA Dorado's review of systems and physical examination of Plaintiff were unremarkable. *Id.* at 535–37. PA Dorado assessed hyperlipidemia, left shoulder pain, neck pain or cervicalgia, and depression with anxiety. *Id.* at 537. On the same date, Plaintiff saw PA Dorado for a check-up. *Id.* at 539–42. Plaintiff reported that he was having ongoing issues with anxiousness, anxiety, and being wound up. AR at 539. Plaintiff also indicated the need for a new cardiologist due to a personality conflict. *Id.* PA Dorado's review of systems and physical examination of Plaintiff were unremarkable. *Id.* at 539–41. PA Dorado's assessment included depression with anxiety, chest pain, hypertensive disorder, hyperglycemia, and left shoulder pain. *Id.* at 541.

On October 7, 2016, Plaintiff was seen by Tedd M. Goldfinger, DO, FACC, FCCP for a second opinion regarding his chest pain. *Id.* at 716–17. Dr. Goldfinger's review of Plaintiff's systems and physical examination were unremarkable. AR at 717. Dr. Goldfinger recommended an angiograph and stressed the importance of tobacco cessation with Plaintiff. *Id.* On November 18, 2016, Plaintiff had magnetic resonance imaging of his left shoulder. *Id.* at 522–23, 643–44, 691–92. Chad Kohl, M.D. reviewed Plaintiff's films and his findings were generally unremarkable. *Id.* at 522, 643, 691. Dr. Kohl did not find any tears of Plaintiff's rotator cuff but noted "[m]oderate insertional supraspinatus and infraspinatus tendinosis[,] [p]ossible mild subacromial-subdeltoid bursitis[,] . . . [and] [m]ild acromioclavicular joint osteoarthritis." *Id.* at 523, 644, 692.

On January 24, 2017, Plaintiff was seen by Jason Stemmer, M.D. for a nuclear medicine myocardial perfusion rest stress test due to an abnormal result of his cardiovascular function study. AR at 713–15. Dr. Stemmer reported that Plaintiff's "chest pain in the absence of ischemic electrocardiographic changes during adenosine infusion . .

. is not specific for myocardial ischemia[;] . . . normal gated spect tomographic rest stress myocardial perfusion imaging examination[;] . . . normal left ventricular regional wall motion and thickening with a calculated left ventricular ejection fraction of greater than 60%[;] [and] . . . overall, the study was consistent with a low likelihood for the presence of stress-induced myocardial ischemia." *Id.* at 713–14.  On January 25, 2017, Plaintiff saw Dr. Untch regarding an exacerbation of his left shoulder, neck, and arm pain.  *Id.* at 637–40, 675–78.  Dr. Untch's review of Plaintiff's systems was generally unremarkable but noted decreased mobility, joint instability, joint tenderness, and weakness.  *Id.* at 638, 676.  Dr. Untch's physical examination of Plaintiff was also unremarkable.  *Id.* at 639, 676-77.

On March 3, 2017, Plaintiff saw PA Dorado to follow-up on lab work which he failed to have done.  AR at 528–30.  PA Dorado's review of systems and physical examination of Plaintiff were unremarkable.  *Id*.  PA Dorado assessment included hyperlipidemia, neck pain or cervicalgia, and coronary artery disease.  *Id.* at 530.  On the same date, Plaintiff saw PA Dorado for a follow-up.  *Id.* at 531–34.  PA Dorado's review of systems and physical examination of Plaintiff were unremarkable.  *Id.* at 531–33.  Also on the same date, Plaintiff had a C-Spine MRI.  AR at 641–42, 673–74, 689–90.  David Jeck, M.D. reviewed Plaintiff's images and found them unremarkable.  *Id.*  Dr. Jeck observed only mild changes with mild to moderate narrowing at C6–7.  *Id.*  On March 13, 2017, Plaintiff saw PA Dorado for a follow-up on his blood work.  *Id.* at 524–27.  Plaintiff reported "that he is doing relatively well."  *Id.* at 524.  PA Dorado's review of systems and physical examination of Plaintiff were generally unremarkable.  AR at 524–26.  PA Dorado assessed hyperglycemia due to Plaintiff drinking over two (2) liters of soda per day, hyperlipidemia, and cervical radiculopathy.  *Id.* at 526.

On April 18, 2017, Plaintiff was seen for a follow up with Dr. Goldfinger.  *Id.* at 718–20.  Dr. Goldfinger's review of Plaintiff's systems and physical examination were unremarkable.  *Id.* at 718–19.  Dr. Goldfinger reported that Plaintiff's "nuclear study was negative for ischemia or infarct[,]" and opined that he "[s]uspect[ed] chest pain [was] of noncardiac etiology."  *Id.* at 719.  Dr. Goldfinger  directed that Plaintiff "may pursue

activities as tolerated." *Id.*

On May 30, 2017, Plaintiff was seen by Brian Callahan, M.D. for a consultation regarding his chronic neck and left arm pain. AR at 666–67. Dr. Callahan's examination of Plaintiff was unremarkable. *Id.* at 666. Dr. Callahan opined that Plaintiff's chronic neck and arm pain was "likely from the mild spondylosis in his neck[,] [and] [t]here [wa]s no need for any surgery." *Id.* As such, he referred Plaintiff to physical therapy and pain management. *Id.* at 666–67.

#### b. Examining physician—Jeri Hassman, M.D.

On October 6, 2017, Jeri Hassman, M.D. examined Plaintiff at the request of Arizona Department of Economic Security. AR at 721–24. Dr. Hassman noted that Plaintiff alleged high blood pressure, neck problems, shoulder problem, high cholesterol, and stomach problems. *Id.* at 721. Plaintiff reported left upper back pain and low back pain, as well as "cancer cells in his throat." *Id.* Plaintiff further reported that his low back pain was associated with tingling of the right lateral thigh, he had occasional tingling of his left forth and fifth fingers, occasional headache, and urinary frequency and urgency. *Id.* at 722. Dr. Hassman reported Plaintiff had "normal ambulation without any limp or complaints of pain" and her examination regarding Plaintiff's ability to stand, walk, balance, bend, kneel, and hop was unremarkable although Plaintiff complained of neck pain when hopping on his right foot. *Id.*

Dr. Hassman further reported that Plaintiff's "[h]ead was atraumatic[,] [c]ranial nerves were intact[,] [and] [h]is voice was slightly hoarse although loud enough to understand." AR at 722. Dr. Hassman observed that Plaintiff's "[n]eck was supple[,] . . . [with a] full range of motion of the cervical spine without pain and no tenderness over the cervical muscles." *Id.* Dr. Hassman's examination of his heart sounds, respiration, and abdomen were unremarkable. *Id.* at 722–23. Dr. Hassman's examination of Plaintiff's upper and lower extremities and thoracic and lumbar spine were similarly unremarkable. *Id.* at 723. Plaintiff informed her "that he had been going to Dr. Chase for epidural steroid injections into his neck and that they were not helping with the neck pain or low back pain.

*Id.*  Prior to her examination, Dr. Hassman had reviewed Plaintiff's medical records and she did not find any physical limitations.  *Id.* at 721–22.

Dr. Hassman also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  AR at 725–31.  Dr. Hassman opined that Plaintiff's condition would impose any limitations for twelve (12) continuous months.  *Id.* at 730.  Dr. Hassman also confirmed that Plaintiff had restrictions in lifting and carrying.  *Id.* at 725. Dr. Hassman opined that Plaintiff could lift or carry between twenty-one (21) and fifty (50) pounds occasionally, twenty (20) pounds or less frequently, and never more than fifty (50) pounds.  *Id.*  Dr. Hassman further opined that Plaintiff's ability to stand and/or walk was limited to four (4) hours in an eight (8) hour day, and that he could stand for two (2) hours at a time and walk for one (1) hour.  *Id.* at 726.  Dr. Hassman noted that Plaintiff had no limitations in sitting beyond limiting the duration to three (3) hours at a time.  AR at 726. Dr. Hassman further noted that Plaintiff did not require an assistive device.  *Id.*

Dr. Hassman opined that Plaintiff could frequently reach in all directions, handle, finger, feel, and push-pull with his dominant right hand.  *Id.* at 727.  Dr. Hassman further opined that Plaintiff could frequently reach in all directions, handle, finger, feel, and push-pull with his left hand, but limited overhead reaching to occasionally.  *Id.*  Dr. Hassman found that Plaintiff was able to occasionally operate foot controls with either foot.  *Id.*  Dr. Hassman also opined that Plaintiff could occasionally climb stairs, ramps, ladders, or scaffolds; balance; kneel; crouch; and crawl, but he could frequently stoop.  AR at 728. Dr. Hassman placed environmental limitations on Plaintiff including never working at unprotected heights; occasionally working around moving mechanical parts; humidity and wetness; dust, odors, fumes, and pulmonary irritants; extreme cold; extreme heat; and vibrations; and frequently working operating a motor vehicle or around loud noise.  *Id.* at 729.  Finally, Dr. Hassman opined that Plaintiff could perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, or 2 canes or 2 crutches; walk a block at a reasonable pace on rough or uneven surfaces; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple

1  meal and feed himself; care for personal hygiene; and sort, handle, or use paper-files.  *Id.*
2  at 730.

3  ### c.  Reviewing physicians

4  #### i.  Martha A. Goodrich, M.D.

5  On August 24, 2015, Martha A. Goodrich, M.D. reviewed Plaintiff's medical
6  records for the initial determination.  AR at 60–62, 87–88.  Dr. Goodrich opined that
7  Plaintiff's medically determinable impairments of hypertension, hyperlipidemia, and
8  GERD were non-severe.  *Id.* at 60–61, 87–88.  Dr. Goodrich further opined that Plaintiff's
9  treating source examinations were "superficial and generally repetitive throughout the
10  [medical evidence of record]."  *Id.* at 60, 87.  Dr. Goodrich determined that the treating
11  source medical evidence of record insufficient "due to [a] lack of adequate physical exams
12  by an acceptable medical source."  *Id.*

13  #### ii.  Christopher Maloney, M.D.

14  On January 19, 2016, Christopher Maloney, M.D. reviewed Plaintiff's medical
15  records for a determination on reconsideration.  AR at 69.  Dr. Maloney observed that
16  Plaintiff's hypertension, low back pain, and shoulder pain were all under medical
17  prescription.  *Id.*  Dr. Maloney also noted that Plaintiff was working repossessing cars.  *Id.*
18  Dr. Maloney opined that Plaintiff was "somatically non-severe."  *Id.*

19

20  ## II.   STANDARD OF REVIEW

21  The factual findings of the Commissioner shall be conclusive so long as they are
22  based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g),
23  1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may
24  "set aside the Commissioner's denial of disability insurance benefits when the ALJ's
25  findings are based on legal error or are not supported by substantial evidence in the record
26  as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see*
27  *also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

28  Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.    ANALYSIS

### A.    The Five-Step Evaluation

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since August 2, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and

416.971 *et seq.*).  AR at 17.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: left shoulder dysfunction, degenerative disc disease, and osteoarthritis of the neck (20 CFR 404.1520(c) and 416.920(c))." *Id.*  The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." *Id.* at 18–19.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform the full range of  light work as defined in 20 CFR 404.1567(b) and 416.967(b)." *Id.* at 19.  At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work as a customer service representative."  AR at 23.  The ALJ further found that "[t]his work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965)." *Id.*  Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 24.

Plaintiff asserts that the ALJ erred in failing to properly weigh the opinion of treating physician, Michael R. Gray, M.D. *See* Opening Br. (Doc. 18).  Plaintiff further asserts that the ALJ committed error by failing to incorporate all of the limitations contained in the examining source opinion of Dr. Hassman regarding his reaching limitations into the residual functional capacity. *See id.*  Finally, Plaintiff asserts that the ALJ was unconstitutionally appointed and as such this matter must be remanded for a new hearing with a different, constitutionally appointed ALJ. *See id.*

### B.    *Treating Physician Testimony*

Plaintiff asserts that "the ALJ's physical RFC determination is not supported by substantial evidence because he failed to appropriately weigh the opinion of Plaintiff's treating physician, Michael R. Gray, M.D."  Pl's Opening Br. (Doc. 18) at 13.  Plaintiff urges that "[t]he ALJ's analysis of these opinions does not comport with the analysis contemplated by regulations as it is based on a mischaracterization of the evidence and is

error." *Id.* at 14.  Further, Plaintiff argues that "the ALJ ignored mountains of evidence including examinations findings, diagnostic imaging" in finding Plaintiff not disabled.  *Id.* at 19.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record."  *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).  Similarly, "[a] physician's opinion can be discredited based on contradictions between the opinion and the physician's own notes."  *Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)).  "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

The ALJ set forth a detailed and thorough summary of the facts and clinical

evidence.  AR at 19–21.  Regarding Dr. Gray's opinions, the ALJ observed that "[t]here is no support stated for the limitations[,] which are not consistent with the medical evidence of record."  *Id.* at 21.  Plaintiff urges that mountains of evidence including examinations findings, diagnostic imaging are contrary to the ALJ's finding; however, the review set forth by the ALJ demonstrates that this evidence consistently describes Plaintiff's condition as "normal," "unremarkable," or mild.  *See id.* 20–21; *see also* AR 353, 464 (PA Dorado noted that Plaintiff's "films demonstrate[d] mild degenerative changes of the lumbar spine[,] [and] [Plaintiff] [wa]s to continue with conservative therapy, muscle relaxer and Norco."); AR 521, 697 (Dr. Osumi reviewed radiographs of Plaintiff's left shoulder and found no abnormalities); AR 654 (Plaintiff reported daily walking for exercise and golf for recreation); AR 630–31, 686–87 (regarding left shoulder pain, Dr. Untch noted "very mild pain" and normal radiographs); AR 636, 683 (Dr. Untch noted normal nerve conduction study and a lack of clarity regarding Plaintiff's symptom description versus findings on examination).

Furthermore, Dr. Gray's opinion appears to be based on Plaintiff's subjective complaints which were properly discounted by the ALJ, a finding to which Plaintiff does not object.  AR at 19–21.  "A physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'"  *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)).  Similarly, "[a] physician's opinion can be discredited based on contradictions between the opinion and the physician's own notes."  *Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)).  Additionally, PA Dorado, a member of Dr. Gray's practice group, was the primary point of contact with Plaintiff and, although not a treating source, his examinations do not contain any suggestion that Plaintiff is as limited as Dr. Gray opines.  *See* Section I.B.3.a., *supra*.

The ALJ's findings are consistent with the medical records in this case.  Plaintiff seeks the ALJ to prove a negative.  The records, however, do not support the limitations

set forth by Dr. Gray.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted).  The ALJ provided "'specific and legitimate reasons' supported by substantial evidence in the record" to reject Dr. Gray's Physical Assessment of Plaintiff. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Accordingly, he did not err.

### C.   *Examining Physician*

Plaintiff asserts that "[t]he AJ's RFC determination is not supported by substantial evidence where, after affording the opinion of consulting examiner, Jeri Hassman, M.D. great weight, he failed to incorporate all of Dr. Hassman's opined limitations into the RFC without any explanation." Pl.'s Opening Br. at 19.

Here, the ALJ reviewed Plaintiff's allegations, his treatment records, the examining physicians' reports, and the medical consultants' findings. *See* AR at 19–22.  Between steps three (3) and four (4) the ALJ assessed Plaintiff's RFC finding that he "has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)." *Id.* at 19.  Based on his analysis of the record, at step four (4) the ALJ found claimant was capable of performing past relevant work as a customer service representative.  AR at 23.  The customer service position, as defined by VE McLeary, is DOT number 249.362-026, with a SVP of 4, and a sedentary exertional level. This position does not require Plaintiff to perform any of the limitations opined by Dr. Hassman.[4]  The ALJ did not err because there is not apparent or obvious conflict between

---

[4] The DOT description states:

Processes orders for material or merchandise received by mail, telephone, or personally from customer or company employee, manually or using computer or calculating machine: Edits orders received for price and nomenclature. Informs customer of unit prices, shipping date, anticipated delays, and any additional information needed by customer, using mail or telephone. Writes or types order form, or enters data into computer, to determine total cost for customer. Records or files copy of orders received according to expected delivery date. May ascertain credit rating of customer [CREDIT CLERK (clerical) 205.367-022]. May check inventory control and notify stock control departments of orders that would deplete

Dr. Hassman's limitations and Plaintiff's past relevant work.  *See Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016) ("the ALJ didn't err because there was no apparent or obvious conflict between the expert's testimony that Ms. Gutierrez could perform as a cashier, despite her weight bearing and overhead reaching limitations with her right arm, and the Dictionary's general statement that cashiering requires frequent reaching. While 'reaching' connotes the ability to extend one's hands and arms 'in any direction,' SSR 85-15, 1985 WL 56857, at *7 (1985), not every job that involves reaching requires the ability to reach overhead. Cashiering is a good example.").  Furthermore, if the ALJ did err in not including Dr. Hassman's additional limitation, such error would be harmless.  *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[W]e may not reverse an ALJ's decision on account of an error that is harmless.").

The Court finds that the ALJ properly considered the record as a whole in making her determination and the RFC for a range of sedentary work is based on a reasonable interpretation of the record.  *See Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1193 (9th Cir. 2004) ("the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record").

### D.    Appointments Clause

Plaintiff    asserts that "[t]he ALJ that heard Plaintiff's application was unconstitutionally appointed and should be barred from further adjudication of Plaintiff's application[,] . . . [which] should be immediately remanded for a new hearing with a

---

stock. May initiate purchase requisitions. May route orders to departments for filling and follow up on orders to ensure delivery by specified dates and be designated Telephone-Order Dispatcher (clerical). May compute price, discount, sales representative's commission, and shipping charges. May prepare invoices and shipping documents, such as bill of lading [BILLING TYPIST (clerical) 214.382-014]. May recommend type of packing or labeling needed on order. May receive and check customer complaints [CUSTOMER-COMPLAINT CLERK (clerical) 241.367-014]. May confer with production, sales, shipping, warehouse, or common carrier personnel to expedite or trace missing or delayed shipments. May attempt to sell additional merchandise to customer [TELEPHONE SOLICITOR (any industry) 299.357-014]. May compile statistics and prepare various reports for management. May be designated according to method of receiving orders as Mail-Order Clerk (clerical); Telephone-Order Clerk (clerical).

different and constitutionally appointed ALJ[.]"  Pl.'s Opening Br. (Doc. 18) at 21.  In support of his argument, Plaintiff relies on the Supreme Court's decision in *Lucia v. S.E.C.*, — U.S. —, 138 S. Ct. 2044, 2051 (2018).

In *Lucia*, the Court considered whether the Security and Exchange Commission's ALJs were "Officers of the United States" subject to the requirements of the Appointments Clause or "simply employees of the Federal Government."  *Lucia*, 135 S. Ct. at 2051; *see also* Art. II, § 2, cl. 2.  The Court found the ALJ in *Lucia* was not properly appointed, and the appropriate remedy was a "new hearing before a properly appointed official."  *Lucia*, 135 S. Ct. at 2055.  An Appointments Clause challenge is nonjuridictional and may be waived.  *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878–79, 111 S. Ct. 2631, 2639, 115 L. Ed. 2d 764 (1991); *Cooper v. U.S. Sec. & Exch. Comm'n*, 799 F. App'x 474, 475 (9th Cir. 2019) ("because [Plaintiff] did not timely raise this issue before the Commission, he may not raise the issue on appeal").  The Supreme Court reiterated this rule noting "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief."  *Lucia*, 135 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 182–83, 115 S. Ct. 2031, 132 L. Ed. 2d 136 (1995)).  The Ninth Circuit Court of Appeals has similarly "held that appellants must raise issues at their administrative hearings in order to preserve them on appeal before this Court."  *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999).

Plaintiff does not dispute that he failed to raise this claim either before the ALJ or the Appeals Council, but points to a smattering of district court cases around the country that support review.  This Court, however, will follow the logic of the district courts in this circuit and finds that Plaintiff forfeited his argument by failing to raise it at any time below.  *See Younger v. Comm'r of Soc. Sec.*, 2020 WL 57814, *5 (January 6, 2020) (collecting cases).  As such, Plaintiff is not entitled to review of his Appointments Clause challenge.

. . .

. . .

. . .

## IV.     CONCLUSION

Based upon the foregoing, the Court affirms the ALJ's decision.  Accordingly, IT IS HEREBY ORDERED that:

1)     Plaintiff's Opening Brief (Doc. 18) is DENIED;

2)     The Commissioner's decision is AFFIRMED; and

3)     The Clerk of the Court shall enter judgment and close its file in this case.

Dated this 29th day of May, 2020.

Honorable Bruce G. Macdonald
United States Magistrate Judge